UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IGNACIO ANDRES BULAHAN,<br><br>    Petitioner,<br><br>  v.<br><br>HEIDI LACKNER, Warden,<br><br>    Respondent. | No. 2:15-cv-1512 KJM GGH P<br><br>ORDER AND FINDINGS AND RECOMMENDATIONS |

   Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges a judgment of conviction entered against him on January 9, 2013 in the Sacramento County Superior Court on charges of first degree murder (Cal. Penal Code §187(a)), with personal use of a deadly weapon (Cal. Penal Code § 12022(b)(1)). He seeks federal habeas relief on the following grounds: (1) insufficient evidence to support a finding of premeditation and deliberation; (2) "CALCRIM No. 362 violates due process, where the language held by this court to rescue the previous pattern instruction (CALJIC No. 2.03) from a due process violation has been replaced with antithetical language;" and (3) ineffective assistance of trial counsel. Upon careful consideration of the record and the applicable law, the undersigned denies petitioner's request for evidentiary hearing, and will recommend that petitioner's application for habeas corpus relief be denied.

/////

I.  <u>BACKGROUND</u>

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

> **The Killing**
>
> Around 12:42 a.m. on May 19, 2004, police found the dead body of Thyotis Jackson lying face down on the sidewalk of First Avenue in the Oak Park area of Sacramento, about a block from the Bonfare Market. Jackson was wearing women's jeans, he had a hair tie on his wrist, and a long-haired women's wig was near his foot. Jackson's T-shirt was pulled over his head, exposing his back. He had stab wounds to the chest and a laceration on his neck.
>
> The pathologist determined that the wound to the neck was consistent with an injury inflicted by a razor or scalpel but did not contribute to Jackson's death. Death was caused by the stab wounds to the chest. The stab wounds were also inflicted by a sharp-edged instrument, but unlike the neck wound, they were deeper than they were long. One stab wound, which was potentially fatal, went through the chest wall and struck his right lung. The other stab wound struck Jackson's heart.
>
> Jackson had abrasions on his head, arm, legs, and back. These were not defensive wounds. The abrasions were consistent with rolling around during a physical altercation or with being beaten by another person.
>
> **The Admission**
>
> Alfred Reyes, Jr., had known defendant for at least 10 years when he testified. In the past, they did drugs together and would "run the streets." In 2004, he was living in a four-unit building on First Avenue. One unit in the building was occupied by Reyes's friend, Aleah Metzler. The residence was about a block away from the Bonfare Market.
>
> One day in 2004, Reyes met defendant at the Bonfare Market. Defendant appeared to be under the influence of alcohol. Reyes invited defendant to come to his residence, which defendant did later that evening. Defendant, who was holding a can of beer when he entered Reyes's residence, asked Reyes if he wanted something to drink. Reyes declined, as he was a tow truck driver and on duty that evening.
>
> Reyes had a utility knife with a locking razor blade tip on top of the television in his living room. He did not consider this to be a box cutter, as the razor blade in the utility knife swung in and out and the diamond-shaped blade was thicker than a box cutter blade. Defendant asked Reyes if he could have the knife; Reyes refused, telling defendant it would get him in trouble.

At one point during the visit, defendant told Reyes he was going out to get more alcohol. Reyes asked how he would pay for it, and defendant replied he would sell his cell phone. Reyes left for some towing jobs after defendant left to buy alcohol. When Reyes returned, defendant was there and had a lot of blood on him. Defendant was panicked and pacing up and down. He appeared to be less intoxicated than when they first met that day.

Defendant told Reyes he had tried to sell his phone to a "colored guy" who was going to give him a "blow job" for it. He said that he met the man at the Bonfare Market. The man tried to take defendant's cell phone, so defendant started hitting him. Defendant said he continued to hit the man when he was down.

Defendant did not tell Reyes that he thought the man was a woman. He did not say that he lost his temper after finding out that the person he had sex with was a man and not a woman. Nor did he tell Reyes that the man attacked him or pulled a knife on him.

Metzler came to Reyes's residence when defendant was there. Defendant had blood on his pants and possibly his shirt. He was walking back and forth in the hallway and talking with Reyes. Metzler heard defendant say he killed a man by slitting his throat from "ear to ear." Defendant said the man he killed wanted oral sex from him, and he killed the man because of a phone. Defendant also said that he wanted the other man's phone.

While she was at Reyes's residence, Metzler noticed a blue knife on the coffee table or on the top of the television. Defendant said he wanted to get rid of the knife.

Before defendant left, Reyes told him to turn his pants inside out or someone would see the blood and ask questions. Defendant left by the back door. The following day, Reyes noticed his knife was missing.

**The Investigation**

Reyes did not immediately report his suspicions to law enforcement because defendant threatened to harm him if he said anything. Reyes first tried to tell someone in 2007, but he was ignored by the authorities. While incarcerated in 2009, Reyes got to know a correctional officer and spoke to him about the case and then later to detectives.

Metzler first reported her account of the incident to the police in 2010. She delayed reporting out of fear because of where she lived. Metzler told police that she heard defendant say a "gay guy" asked him to do something sexual and he consequently "went off the hook" because he did not like what the man said. She also said this story sounded like something defendant was going to say but the real story involved defendant wanting to steal a cell phone.

A surveillance video from the Bonfare Market showed defendant first appearing on May 18, 2004, at 11:08 p.m. and last appearing

on May 19, 2004, at 12:21 a.m. In the last appearance, defendant was seen walking toward a vacant field. Jackson's body was discovered just beyond the field about 20 minutes later.

Defendant's DNA profile was consistent with the DNA profile of sperm found in Jackson's mouth. The possibility of a random match among unrelated individuals ranged from 1 in 230 quintillion to 1 in 2 quintillion.

Defendant was arrested in April 2010. His social visits at jail were recorded. During one visit, defendant told his visitor: "... I just need to figure out what they got against me, you feel me?" The visitor said they had DNA, a witness, and the store video, and defendant replied, "... I mean if they don't have the act on video then you know what I'm saying?" Later, when defendant was talking to the visitor about the identity of the witness, he said "get up with that nigga who use[d] to drive the tow truck, bro, yep, him and his bitch, them the only ones bro."

**The Defense**

Testifying on his own behalf, defendant admitted four prior felony convictions for auto theft offenses and a prior conviction for possession of a controlled substance while possessing a firearm. Defendant consumed a lot of alcohol and some methamphetamine on May 18, 2004. He walked to the Bonfare Market during the late afternoon or early evening and met Reyes, a prior acquaintance, who invited him over to his residence. Defendant went to Reyes's place sometime between 6:00 and 8:00 p.m.

After spending an hour or two with Reyes, defendant left and went back to the store. Defendant wanted more alcohol, so he sold his cell phone for $20 or $25, which he spent on drugs and alcohol. He met a person who he thought was a prostitute, but this was not the person who bought the phone from him. Defendant agreed to give the prostitute drugs in return for oral sex. He thought the prostitute, Jackson, was a woman.

Defendant and Jackson walked through a field to a really dark doorway on First Avenue, where Jackson performed oral sex on him. Defendant used a condom, but it broke and he ejaculated into Jackson's mouth. This upset Jackson, who then told defendant he was in fact "a boy." Defendant became very upset, as he had strong feelings about homosexuality. He then swung at Jackson, who started fighting with defendant. As they fought, Jackson pulled out a four- to five-inch long pocket knife. After hearing the knife fall to the ground, defendant picked it up and swung it twice in anger with a swinging motion. The fight then ended and Jackson ran away, still wearing his wig. Defendant ran in the opposite direction and threw the knife down a drain.

Defendant admitted killing Jackson but said he did not intend to do so. He told Reyes he fought with Jackson but did not say that he killed him. Defendant also told Reyes there was a guy who was going to give him oral sex; he knew the person was a man, and

> never told Reyes he thought the person was a woman. He also told Reyes he had been robbed and he beat up someone. Defendant was upset with Reyes for "telling on" him, which is why he told someone to get Reyes's "bitch ass" after he was arrested.
>
> A psychologist interviewed defendant, reviewed his criminal record, and tested him. Defendant told the psychologist about the incident. Defendant presented as impulsive, reactive, and under controlled. He also showed significant substance abuse problems.
>
> Defendant was presented as heterosexual, without a healthy level of comfort about homosexuality. He was prone to act out or cause problems in his interpersonal relationships, and killing someone was a dramatic means of acting out. Violence between people is more common when they are under the influence of methamphetamine and alcohol. A person prone to acting out and in the middle of a fight might suddenly escalate the fight without considering the consequences.

People v. Bulahan, No. C073125, 2014 WL 2700363, at *1-3 (Cal. Ct. App. June 9, 2014).

II. ANALYSIS

    A. AEDPA Standards

The statutory limitations of federal courts' power to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), clearly established federal law consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir.2013) (citing Greene v. Fisher, ––– U.S. –––, ––––, 132 S.Ct. 38, 44 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir.2011) (citing Williams v. Taylor, 529 U.S. 362, 405–06, 120 S.Ct. 1495 (2000)).  Circuit precedent may not be

5

"used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, ––– U.S. ––––, ––––, 133 S.Ct. 1446, 1450 (2013) (citing Parker v. Matthews, ––– U.S. ––––, ––––, 132 S.Ct. 2148, 2155 (2012)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct. Id.

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640, 123 S.Ct. 1848 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[1] Lockyer v. Andrade, 538 U.S. 63, 75, 123 S.Ct. 1166 (2003); Williams, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir.2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 412. See also Schriro v. Landrigan, 550 U.S. 465, 473, 127 S.Ct. 1933 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.' "). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on

---

[1] The undersigned also finds that the same deference is paid to the factual determinations of state courts. Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir.2004)). It makes no sense to interpret "unreasonable" in § 2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the same record could not abide by the state court factual determination. A petitioner must show clearly and convincingly that the factual determination is unreasonable. See Rice v. Collins, 546 U.S. 333, 338, 126 S.Ct. 969, 974 (2006).

1   the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101, 131 S.Ct.
2   770 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140 (2004)).[2]
3   Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner
4   must show that the state court's ruling on the claim being presented in federal court was so
5   lacking in justification that there was an error well understood and comprehended in existing law
6   beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at 103.

7   The court looks to the last reasoned state court decision as the basis for the state court
8   judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir.2004). If
9   the last reasoned state court decision adopts or substantially incorporates the reasoning from a
10  previous state court decision, this court may consider both decisions to ascertain the reasoning of
11  the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir.2007) (en banc).
12  "[Section] 2254(d) does not require a state court to give reasons before its decision can be
13  deemed to have been 'adjudicated on the merits.'" Harrington, 562 U.S. at 100. Rather, "[w]hen
14  a federal claim has been presented to a state court and the state court has denied relief, it may be
15  presumed that the state court adjudicated the claim on the merits in the absence of any indication
16  or state-law procedural principles to the contrary." Id. at 784-85. This presumption may be
17  overcome by a showing "there is reason to think some other explanation for the state court's
18  decision is more likely." Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803, 111 S.Ct.
19  2590 (1991)). Similarly, when a state court decision on a petitioner's claims rejects some claims
20  but does not expressly address a federal claim, a federal habeas court must presume, subject to
21  rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, ––– U.S. –––
22  –, ––––, 133 S.Ct. 1088, 1091 (2013).

23  When it is clear, however, that a state court has not reached the merits of a petitioner's
24  claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal
25  habeas court must review the claim de novo. Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462

---

[2] "For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Harrington, 562 U.S. at 101, citing Williams v. Taylor, 529 U.S. 362, 410, 120 S.Ct. 1495 (2000).

7

F.3d 1099, 1109 (9th Cir.2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir.2003).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision. Early v. Packer, 537 U.S. 3, 8, 123 S.Ct. 362, 365 (2002). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." Harrington, 562 U.S. at 98.

A summary denial is presumed to be a denial on the merits of the petitioner's claims. Stancle v. Clay, 692 F.3d 948, 957 & n. 3 (9th Cir.2012). While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." Harrington, 562 U.S. at 98. This court "must determine what arguments or theories ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 786. "Evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.'" Id. Emphasizing the stringency of this standard, which "stops short of imposing a complete bar of federal court relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id., citing Lockyer v. Andrade, 538 U.S. 63, 75, 123 S.Ct. 1166 (2003).

/////

/////

8

The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d 925, 939 (9th Cir.2013) (quoting Harrington, 562 U.S. at 98).

B. Petitioner's Claims

1. Whether evidence was insufficient to support a finding of premeditation and deliberation

Petitioner's first claim is that the evidence was insufficient to support a finding that he acted with premeditation and deliberation to support a verdict of first degree murder.

When a challenge is brought alleging insufficient evidence, federal habeas corpus relief is available if it is found that upon the record evidence adduced at trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found "the essential elements of the crime" proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 278 (1979). Jackson established a two-step inquiry for considering a challenge to a conviction based on sufficiency of the evidence. U.S. v. Nevils, 598 F.3d 1158, 1164 (9th Cir.2010) (en banc). First, the court considers the evidence at trial in the light most favorable to the prosecution. Id., citing Jackson, 443 U.S. at 319, 99 S. Ct. 2781. "'[W]hen faced with a record of historical facts that supports conflicting inferences,' a reviewing court 'must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" Id., quoting Jackson, 443 U.S. at 326, 99 S. Ct. 2781.

"Second, after viewing the evidence in the light most favorable to the prosecution, a reviewing court must determine whether this evidence, so viewed is adequate to allow 'any rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'" Id., quoting Jackson, 443 U.S. at 319, 99 S. Ct. 2781. "At this second step, we must reverse the verdict if the evidence of innocence, or lack of evidence of guilt, is such that all rational fact finders would have to conclude that the evidence of guilt fails to establish every element of the crime beyond a reasonable doubt." Id.

Put another way, "a reviewing court may set aside the jury's verdict on the ground of

insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v. Smith, ___ U.S. ___, 132 S.Ct. 2, 4 (2011). Sufficiency of the evidence claims in federal habeas proceedings must be measured with reference to substantive elements of the criminal offense as defined by state law. Jackson, 443 U.S. at 324 n.16.

"Jackson leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial," and it requires only that they draw "'reasonable inferences from basic facts to ultimate facts.'" Coleman v. Johnson, ___ U.S. ___, 132 S.Ct. 2060, 2064 (2012) (per curiam) (citation omitted). "'Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction.'" Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir.1995) (citation omitted).

Superimposed on these already stringent insufficiency standards is the AEDPA requirement that even if a federal court were to initially find on its own that no reasonable jury should have arrived at its conclusion, the federal court must also determine that the state appellate court not have affirmed the verdict under the Jackson standard in the absence of an unreasonable determination. Juan H. v. Allen, 408 F.3d 1262 (9th Cir. 2005). Because this claim is governed by the AEDPA, this court owes a "double dose of deference" to the decision of the state court. Long v. Johnson, 736 F.3d 891, 896 (9th Cir. 2013) (quoting Boyer v. Belleque, 659 F.3d 957, 960 (9th Cir. 2011).

The California Court of Appeal rejected this argument, as set forth in the following portion of the opinion:

> Defendant contends there is insufficient evidence of premeditation to support his conviction for first degree murder. We disagree.
>
> In considering a challenge based on sufficiency of the evidence, we review the entire record in a light most favorable to the judgment to determine whether the record contains evidence that is reasonable, credible, and of solid value from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Silva* (2001) 25 Cal.4th 345, 368.) We will not reverse if the circumstances reasonably justify the jury's findings. (*People v. Perez* (1992) 2 Cal.4th 1117, 1124 (Perez).)
>
> Deliberation and premeditation can occur in a brief interval. (*People v. Solomon* (2010) 49 Cal.4th 792, 812.) The test is not time but reflection; thoughts may follow each other with great

rapidity and calculated judgment may occur quickly. (*Ibid*.) Generally, there are three categories of evidence, referred to as the *Anderson* factors, [People v. Anderson (1968) 70 Cal.2d 15, 26-27] sufficient to support deliberation and premeditation: (1) planning activity; (2) preexisting motive; and (3) deliberate manner of killing. (*Solomon*, *supra*, 49 Cal.4th at pp. 812–813.) To convict, a jury need not hear evidence in all three categories. (*People v. Elliot* (2005) 37 Cal.4th 453, 470–471.) If evidence of all three categories is not present, then "'"we require either very strong evidence of planning, or some evidence of motive in conjunction with planning or a deliberate manner of killing." [Citation.]'" (*Ibid*.) The Anderson factors are not exhaustive; the prosecution need not offer evidence of all three types to support a finding of deliberation and premeditation. (*Perez*, *supra*, 2 Cal.4th at p. 1125.)

Defendant claims the evidence is more consistent with a verdict of voluntary manslaughter or second degree murder than first degree murder. As evidence of provocation, defendant relies on his taking alcohol and methamphetamine, and the fact that he believed Jackson was a woman when he was in fact a man who informed him of this after giving him oral sex. He finds that those circumstances "could reasonably create intense emotion obscuring judgment even in someone who is not homophobic." According to defendant, there was no evidence of motive, planning activity, or conduct of the killing that would be consistent with premeditation. He concludes that "[t]he only reasonable inference to be drawn from these facts is that the killing was the product of a combination of alcohol intoxication, methamphetamine intoxication, provocation not amounting to that necessary for voluntary manslaughter, evidence of a struggle, and unconsidered impulse, rather than being the product of a deliberate judgment or plan coolly and steadily carried out according to a preconceived design."

There is evidence of both planning and motive. According to Reyes's testimony, defendant wanted to buy more alcohol. When he left Reyes's residence to get the alcohol, defendant needed money to do so and told Reyes he would sell his phone. The jury could reasonably find that defendant took the knife from Reyes's residence even though Reyes told him he could not take it: defendant brought up the knife before the trip to get alcohol, Reyes told him not to take it as it would get him in trouble, and the knife was missing the following day. Finally, Metzler heard defendant say he killed a man over a phone and that he wanted this man's phone. From this, the jury could reasonably conclude that defendant wanted to acquire a cell phone when he left to get alcohol, armed himself to better enable him to do so by force, and killed Jackson in order to take his cell phone.

The manner of Jackson's death is further evidence of premeditation. The location of stab wounds and lack of defensive wounds can be evidence of premeditation. (*People v. Pride* (1992) 3 Cal.4th 195, 247.) There were no defensive wounds on Jackson and the location of the three stab wounds supported a finding of premeditated intent to kill. Two of the wounds, through the chest to the lungs and through the chest to the heart, were fatal or potentially fatal and in

11

> locations likely to produce this result. While the third wound, the neck laceration, was not medically serious, Metzler heard defendant tell Reyes he killed the man by slitting his throat from ear to ear. In light of the evidence of planning and motive, the jury could reasonably infer that defendant intended for the neck wound to be fatal. Taken together, the lack of defensive wounds and the infliction of three wounds that could be or were intended to be fatal is additional evidence of premeditation.
>
> Whether there is evidence supporting a verdict of voluntary manslaughter or second degree murder is irrelevant. So long as sufficient evidence supports the jury's verdict, we will not consider whether the evidence could support conviction on a lesser offense. Such is the case here. Evidence of planning, motive, and the deliberate manner of killing constitute sufficient evidence of premeditation.

People v. Bulahan, No. C073125, 2014 WL 2700363, at *3-4 (Cal. Ct. App. June 9, 2014).

In this case, petitioner was convicted of first degree murder in violation of California Penal Code § 187, which states: "(a) Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." Malice is then defined as follows:

> Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.
>
> When it is shown that the killing resulted from the intentional doing of an act with express or implied malice as defined above, no other mental state need be shown to establish the mental state of malice aforethought. …

Cal. Penal Code § 188. Implied malice exists "when a defendant is aware that he is engaging in conduct that endangers the life of another." People v. Cravens, 53 Cal.4th 500, 507 (2012).

Second degree murder contains the same elements as first degree murder, but without the additional elements of willfulness, premeditation, and deliberation, which first degree murder requires. People v. Sandoval, ___ Cal.4th ___, 2015 WL 9449719 at *19 (Dec. 24, 2015).

The jury was given instructions for first degree murder, second degree murder, and manslaughter. (RT. 192-201, 203-204.)

In his traverse, petitioner argues that the evidence was insufficient to find first degree murder, and the evidence instead supports a verdict for second degree murder only. Although the

1    petition contains no argument, in the traverse petitioner argues that the evidence against him was
2    not reliable in that witness Reyes did not come forward until five years after the alleged murder
3    only after his own arrest, and testified in order to "mitigate his own conflict with society." (ECF
4    No. 13 at 5.) Witness Metzler, according to petitioner, did not come forward until six years after
5    the incident, and her testimony was based on petitioner's drug and alcohol fueled rant while he
6    was upset and in shock over the immediately preceding events, which she overheard while in
7    another room of the apartment. (Id. at 9.) Petitioner contends that both witnesses had no personal
8    knowledge of the incident and provided only hearsay testimony. Petitioner contends there is no
9    witness with personal knowledge to refute his account of the incident which he characterizes as "a
10   mutual combative encounter subsequent to having consen[s]ual sex." (Id. at 5.) He also asserts
11   that there was no evidence to contradict that he was drunk or under the influence of drugs, which
12   would impair his perception and judgment. (Id.)

13   Petitioner further contends that the prosecution theory that the homicide resulted from a
14   robbery that went bad is not correct. Rather, petitioner argues, he attacked the victim solely upon
15   discovering that the person with whom he just had a sexual encounter was a man and not a
16   woman as he had believed. He cites other state court cases where the defendant was convicted of
17   second degree murder based on a more violent scenario. Petitioner argues that one fatal wound to
18   the heart does not demonstrate premeditation or deliberation. Furthermore, he contends, the
19   victim was not a neophyte to street life or prostitution, but entered into a consensual arrangement
20   of exchanging drugs for sex, and went into a dark open field with petitioner of his own will
21   without force or fear, thereby demonstrating that petitioner did not initiate it for purposes of
22   robbery, but because he was under the influence of methamphetamine and wanted sex. Petitioner
23   argues that there was no evidence that the victim even owned a cell phone to begin with, and that
24   the police never investigated this important fact, either by talking to the victim's friends and
25   family, or obtaining cell phone records, but instead relied on the memory of witness Metzler from
26   six years earlier. (Id. at 7.) As a result, petitioner concludes that there was insufficient evidence
27   of motive and intent to rob the victim.

28   First, in regard to his claim that he was under the influence of drugs and alcohol at the

time of the event and that this fact somehow minimizes his culpability, a jury instruction concerning "voluntary intoxication causing unconsciousness: effects on homicide cases" was given. Only if the defendant is unconscious during the commission of the homicide is the crime considered involuntary manslaughter. (RT. 200.) If a person is voluntarily intoxicated but conscious, he assumes the risk of that effect, and his crime is not minimized to involuntary manslaughter. (Id.) If the government does not meet its burden to show defendant was not unconscious, the defendant must be found not guilty of murder or voluntary manslaughter. (Id. at 201.) There is no evidence that petitioner was not voluntarily intoxicated or that he was unconscious during the homicide. In fact, Reyes testified to petitioner's state of intoxication near the time of the event, that he had slurred speech and wobbly movement. Reyes in no way testified that petitioner was unconscious. (RT. 114.) Therefore, his intoxication does not reduce his responsibility or minimize the evidence against him.

      Second, it was not necessary that witnesses Reyes and Metzler have personal or eyewitness knowledge of the homicide. Each witness testified to important facts that occurred before and after the killing which supported the prosecution theory of motive, planning and deliberate manner of killing by defendant, which were necessary to a verdict of first degree murder. Reyes' testimony was directed toward petitioner's plan to take a knife with him, a deadly weapon to possibly be used in the furtherance of his stated plan or motive to buy alcohol, for which he needed money. In fact, Reyes testified that when petitioner showed up at Reyes' apartment in a panic with blood on him, petitioner explained that he had been trying to get a blow job in exchange for his cell phone from a "colored guy." He never mentioned to Reyes that he initially thought the guy was a woman. He also explained to Reyes that the guy did not perform the sexual favor as agreed and instead took petitioner's phone. (RT. 108-109.) Reyes clarified that petitioner did not tell Reyes whether the blow job had actually been performed or not. (RT. 110.) As testified by Reyes, petitioner explained that because the victim tried to take his phone, petitioner had to beat him up. (RT. 108-109.) Reyes testified that he tried to tell police officers about his knowledge relating to this incident before five years had passed, but he was ignored until 2009. (RT. 122.) He also testified that defendant had previously threatened to hurt him if he

told anyone what happened and that is why he did not come forward earlier. (RT. 123.) Reyes also testified that he asked for nothing from law enforcement in return for coming forward, and that he received nothing in return for his testimony. (RT. 125-126.) Petitioner had seemingly competent counsel who could have questioned Reyes (and Metzler) about the length of time it took for them to come forward after the murder, and about Reyes' motivation for doing so, but declined to do so.

Metzler testified to petitioner's state of mind and culpability after the fact, where she heard him say he had killed a man, that he had wanted this man's cellphone. Although petitioner claims that this neighbor was in another room of the apartment when she allegedly overheard petitioner's confession, she testified that she observed blood on the clothes he was wearing and also saw him pacing in Reyes' apartment. (RT. 144, 147.) She additionally heard him say that he "killed somebody" and "slit some guy's throat" "over a phone he wanted." (RT. 148-149.) She also testified that she heard petitioner tell Reyes that that he was planning to say that it was about the victim wanting sex from petitioner, even though it was because he wanted the victim's phone. (RT. 149-150, 152.) On cross-examination, she testified that she did not remember telling police (six years post-incident) that the victim asked for a sexual favor but did not mention to the police officer that this was a story petitioner was planning to tell. (RT. 159-160.) On re-direct, after being shown the transcript of the officer's report, Metzler re-read the report and confirmed that she had told the officer that she didn't know if the story about the sexual favor was one that petitioner made up, but that the cell phone that he wanted was maybe the real story. (RT. 161-162.) Metzler testified that petitioner's demeanor at this time was "very nervous" and "going crazy." (RT. 159.) Metzler testified that although she heard petitioner confess to the crime, she did not report it to police because she lived in Oak Park and was afraid. (RT. 154.) Metzler was re-cross-examined and examined on re-direct on this point, and her memory of what petitioner said in regard to making up a story did not appear to be clear. (RT. 162-63.) The jury heard this colloquy, however, and its job was to make sense of it, along with the other testimony and evidence.

In sum, although witnesses Reyes and Metzler did not witness the killing, their testimony

supported the prosecution theory of willfulness, premeditation (including planning, motive and deliberate manner of killing), and deliberation.

Petitioner was free to provide his own testimony supporting his scenario of the facts, which is based on mutual combat after consensual sex, and he did so. (RT. 262-273.) From there, the jury was free to choose which theory to believe in coming to its verdict. Yes, there was evidence from which the jury could have determined heat of passion at the time petitioner discovered the victim who had just sexually serviced him was a man. But such possibility is not the touchstone of the sufficiency analysis. As stated previously, the fact that several possible legal outcomes existed does not mean that the outcome chosen by the jury is insufficient.

This court may not disturb the jury's factual findings unless there is clear and convincing evidence to the contrary. See 28 U.S.C. § 2254(e)(1). The evidence as a whole does not support petitioner's view, and in any event is simply petitioner's take on the evidence presented.

It is true that the victim was a man who was possibly dressing as a woman; however, as recounted by the California Court of Appeal, petitioner stated his intent to Reyes, that he wanted to buy more alcohol but needed to sell his phone to do so. He also asked Reyes for a knife he saw in Reyes' apartment before the event, and Reyes said no, that "it would just get him in trouble." (RT. 100) Reyes noticed the next day that the knife was missing from his apartment. Metzler heard petitioner say after the event that he had killed a man over a phone. This evidence, along with the location of the stab wounds that were three in number, and lack of defensive wounds, demonstrates motive, planning and deliberation. Petitioner had the opportunity to change his plan along the way and turn away, as he stopped at the store first, and then walked across a field with the victim, but nevertheless he continued with his plan, stabbing him enough times to ensure he was dead. Petitioner was heard to say after the fact that he had killed the man by slitting his throat from ear to ear.

Of course, petitioner's arming himself with the knife, and taking the victim to a dark field so they would not be seen leaves little doubt that planning to kill the victim was deliberately contemplated. As the appellate court noted, the manner in which this aggression was carried out certainly indicates the intent to kill with premeditation and deliberation.

The jury was free to believe or disbelieve petitioner's version of events. It was up to the jury to determine *from all the* facts whether petitioner's mindset was heat of passion, malice aforethought, or willful, deliberate and premeditated. Put another way, the jury was free to conclude that petitioner did not kill the victim because he discovered "she" was really a "he" after the victim had provided oral sex, which caused him to become enraged, and that they engaged in mutual combat. While petitioner may have been angry at the time he stabbed the victim, the jury was free to instead rely on the other evidence indicating an intent to kill someone over a phone.

Simply because petitioner could present a possible scenario at odds with a finding of willfulness, premeditation and deliberation, does not mean that the evidence in its totality was insufficient. Many trials contain conflicting evidence, but the mere presence of conflicting evidence does not warrant a finding that the jury's decision to convict is based on insufficient evidence.

Viewing the evidence in the light most favorable to the verdict, and with the understanding that the appellate court conclusion of sufficiency must be AEDPA unreasonable in order to grant a petition based on insufficiency, the undersigned concludes that there was sufficient evidence from which a rational trier of fact could have found beyond a reasonable doubt that petitioner acted with the intent to kill the victim after having deliberated about it.

The state courts' denial of habeas relief with respect to petitioner's insufficient evidence claim is not an objectively unreasonable application of <u>Jackson</u> and <u>Winship</u> to the facts of the case. Accordingly, petitioner is not entitled to federal habeas relief with respect to this claim.

2. <u>Claims 2 and 3</u>

In the introduction of his traverse, although petitioner requests relief on all three grounds raised, as well as an evidentiary hearing, (ECF No. 13 at 2), he voluntarily dismisses grounds two and three of his petition in the body of his traverse, going into detailed explanation why he is dismissing them. (<u>Id.</u> at 10.) He dismisses ground two based on his "conceded guilt of second degree murder," and that the instruction he was complaining about "does not measure degree of guilt, only that a measure of guilt can be applied if the jury found that Petitioner knowingly made false statements to the psychologist/psychiatrist." In regard to ground three, petitioner makes the

1  same concession of his guilt in regard to second degree murder, and therefore alleged attorney
2  "ineffectiveness as to whose knife it was, and to which knife inflicted the fatal wound to
3  Jackson's heart is irrelevant and does not go to the issue of guilt or innocence." (Id.)
4  Accordingly, the undersigned accepts the dismissal in the body of the traverse as it is explained
5  therein, and views the introduction as mere boilerplate.

### C. REQUEST FOR EVIDENTIARY HEARING

In his traverse, petitioner has requested an evidentiary hearing. (ECF No. 13 at 2.) In Cullen v. Pinholster, 563 U.S. 170, 131 S. Ct. 1388 (2011), the United States Supreme Court held that federal review of habeas corpus claims under § 2254(d)(1) is "limited to the record that was before the state court that adjudicated the claim on the merits."[3] 131 S. Ct. at 1398. Therefore, evidence introduced at an evidentiary hearing in federal court may not be used to determine whether a state court decision on the merits of a petitioner's habeas claim violates § 2254(d). Id. Following the decision in Pinholster, the holding of an evidentiary hearing in a federal habeas proceeding is futile unless the district court has first determined that the state court's adjudication of the petitioner's claims was contrary to or an unreasonable application of clearly established federal law, and therefore not entitled to deference under § 2254(d)(1), or that the state court unreasonably determined the facts based upon the record before it, and therefore deference is not warranted pursuant to § 2254(d)(2).

Petitioner does not articulate why an evidentiary hearing is needed, and the court can discern no reason why one would be necessary. This court has already determined that the state court's decision was not contrary to or an unreasonable application of clearly established federal law. Nor was it an unreasonable determination of the facts. Therefore, petitioner's request for an evidentiary hearing is denied.

### III. CONCLUSION

For all of the foregoing reasons, the petition should be denied. Pursuant to Rule 11 of the

---

[3] Even where a claim for habeas relief is simply summarily denied by the state court on the merits without discussion or analysis, as was the case in Pinholster, the federal habeas court is still ordinarily limited to consideration of the record that was before the state court. 131 S. Ct. at 1402 ("Section 2254(d) applies even where there has been a summary denial.").

Federal Rules Governing Section 2254 Cases, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate of appealability may issue only "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). For the reasons set forth in these findings and recommendations, a substantial showing of the denial of a constitutional right has not been made in this case.

Accordingly, IT IS ORDERED that:

1. Pursuant to petitioner's request for voluntary dismissal, Grounds Two and Three are dismissed. Fed. R. Civ. P. 41(a); see also Rule 12, Rules Governing Habeas Corpus Cases Under Section 2254.

2. Petitioner's request for an evidentiary hearing is denied.

For the reasons stated herein, IT IS HEREBY RECOMMENDED that:

1. Petitioner's application for a writ of habeas corpus (Ground One) be denied; and

2. The District Court decline to issue a certificate of appealability.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: April 17, 2016

/s/ Gregory G. Hollows

UNITED STATES MAGISTRATE JUDGE

GGH:076/Bula1512.hc